```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES OF AMERICA          :

    -v.-                          :         16 Cr. 467 (ALC)

NORMAN SEABROOK and               :
MURRAY HUBERFELD,
                                  :
            Defendants.
                                  :
---------------------------------------------------------------x
```

# GOVERNMENT'S MOTIONS *IN LIMINE*

                                        JOON H. KIM
                                        Acting United States Attorney
                                        Southern District of New York
                                        Attorney for the United States of America

Martin S. Bell
Russell Capone
Kan M. Nawaday
Assistant United States Attorneys
- Of Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES OF AMERICA            :

   -v.-                             :        16 Cr. 467 (ALC)

NORMAN SEABROOK and                 :
MURRAY HUBERFELD,
                                         :
                Defendants.
                                         :
---------------------------------------------------------------x

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

The Government respectfully seeks rulings *in limine* in advance of trial permitting the Government to introduce evidence of (1) $28,700 in cash that was seized from Seabrook's residence at the time of his arrest; and (2) Seabrook's power to unilaterally direct the activities of the executive board of the Correction Officers Benevolent Association ("COBA"), of which Seabrook was the President.

**I.**     **THE COURT SHOULD ADMIT EVIDENCE OF SUBSTANTIAL AMOUNTS OF CASH THAT WERE SEIZED FROM SEABROOK'S RESIDENCE AT THE TIME OF HIS ARREST**

The Government submits that it should be permitted to introduce evidence of $28,700 in cash that was seized from defendant Norman Seabrook's home at the time of his arrest. That evidence is plainly relevant to the charged offense, and therefore admissible.

**A.  Relevant Facts**

As set forth in more detail in the Complaint, the Indictment, and prior briefing in this matter, the Government expects to present evidence at trial that defendant Murray Huberfeld agreed to pay Seabrook cash bribes as part of the honest services fraud scheme charged in Count One and Two of the Indictment. (*See* Indictment ¶¶ 12-15). Specifically, Huberfeld agreed that

Platinum Partners, a hedge fund which Huberfeld helped to found and manage, would make annual bribe payments of tens of thousands of dollars to Seabrook; in exchange, Seabrook agreed to direct that COBA, a union of which he was President, invest millions of dollars in a Platinum Partners fund. (*See id*. ¶¶ 15-17).

In this regard, as set forth in the Complaint and Indictment, after Seabrook fulfilled his part of the illegal bargain by having COBA invest $20 million in a Platinum Partners fund over the course of approximately six months in 2014, Huberfeld made an initial $60,000 kickback payment to Seabrook. Specifically, on or about December 11, 2014, a cooperating witness for the Government ("CW-1"), who had helped broker the deal between Huberfeld and Seabrook, gave Seabrook $60,000 in cash; CW-1 was later reimbursed with a check from Platinum Partners. To effect the bribe payment, CW-1 met Seabrook in Manhattan; entered Seabrook's car; and handed Seabrook a Salvatore Ferragamo bag (the "Bag"), which CW-1 had purchased earlier that day for the express purpose of using it to transport the $60,000, knowing that Ferragamo was Seabrook's favorite luxury brand. The $60,000 was inside the Bag when it was handed to Seabrook, who then kept the bag and the money. (Indictment ¶¶ 18-20). After the hand-off, Seabrook, CW-1, an NYPD official, and an unindicted co-conspirator not named in this case had dinner at a nearby restaurant. (Complaint ¶ 15(q)).

On June 8, 2016, Seabrook was arrested on the Complaint, and a judicially authorized search warrant was executed at his residence (the "Seabrook Residence"). During the search, agents recovered, among other things, $28,700[1] in cash and a Salvatore Ferragamo bag matching the description of the Bag that was used to transport the $60,000 cash payment to Seabrook. The Government expects to present testimonial and documentary evidence, such as credit card and

---

[1] An additional $2,550 was seized but was returned on the representation of defense counsel that that money constituted a deposit of a renter and/or tenant.

business records of Salvatore Ferragamo, suggesting that the Bag is the same bag that was purchased by CW-1.

   **B. Discussion**

The cashed seized from Seabrook's residence is relevant to the charged offense and therefore admissible.

All relevant evidence is admissible under the Federal Rules of Evidence unless specifically excluded. Fed. R. Evid. 402; *Huddleston* v. *United States*, 485 U.S. 681, 687-688 (1988). Evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401; *United States* v. *Monk*, 577 Fed. App'x. 8, 9 (2d Cir. 2014). Further, "[t]he definition of relevant evidence is very broad[;] ... Rule 401 does not raise a high standard." *Moyer* v. *United Dominion Industries, Inc.*, 473 F.3d 532, 544-545 (3d Cir. 2007) (internal quotations and citations omitted); *see Huddleston*, 485 U.S. at 687.

Under this definition, the $28,700 in cash recovered from the Seabrook Residence is plainly relevant to this case. The fact that a significant amount of cash was found in Seabrook's home undoubtedly has a tendency to show that he took a large cash payment from CW-1 as part of the kickback scheme.

*First*, the amount itself is significant. It is a substantial amount of cash to have on hand, especially given that the Government expects to present evidence that Seabrook's only employment during the relevant time period was his position as COBA's president, for which he was paid an annual salary of approximately $150,000 to $200,000 (which the Government believes is net of taxes). The evidence will further show that Seabrook's salary was typically paid by check and deposited into his bank account, undercutting any argument that the cash came

3

from his employment, and supporting the inference that the cash constitutes the proceeds of the charged illegal conduct. *Cf. United States* v. *Hogan*, 886 F.2d 1497, 1507 (7th Cir. 1989) (noting that "evidence of $20,000 of undeclared income would arguably have been admissible in a trial for bribery"). On this score, courts have held that evidence of unexplained wealth is admissible to establish that a person was engaged in a cash-based crime, even if there is another explanation for the extra money. *See United States* v. *Bowie*, 515 F.2d 3, 9 (7th Cir. 1975); *United States* v. *Higgans*, 507 F.2d 808, 813 (7th Cir.1974); *see also United States* v. *Magnano*, 543 F.2d 431, 437 (2d Cir. 1976) (affirming admission of $500,000 in cash seized from defendant's home at time of arrest, which was a year after the drug conspiracy ended), *cert. denied*, 429 U.S. 1091, 97 S. Ct. 1101, 51 L.Ed.2d 536 (1977); *United States* v. *Tramunti*, 513 F.2d 1087, 1105 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S. Ct. 54, 46 L.Ed.2d 50 (1975).

*Second*, while the amount of money seized was considerably less than $60,000, this should be hardly surprising, and in fact is consistent with the timing of the kick-back payment. The hand-off of the $60,000 in the Bag occurred approximately 19 months before Seabrook's arrest; as such, it would be reasonable to assume that a portion of the cash bribe had been disposed of by Seabrook by that time.

*Third,* the seizure of the Bag at the Seabrook Residence further supports the relevance and admissibility of the cash. As noted, the $60,000 kick-back was given to Seabrook by CW-1 in the Bag, which, the evidence will suggest, is in fact the same bag that was purchased by CW-1.

Nor does it matter, for admissibility purposes, that there may an alternative explanation for the source of the seized cash. Indeed, the Government expects Seabrook to argue that the cash came from another source, for example, gambling winnings. However, that argument goes

4

to the weight to be given to the cash, and not its admissibility. *United States* v. *Hogan*, 886 F.2d 1497, 1507 (7th Cir. 1989) ("Evidence that the money came from another source goes to the weight and not the admissibility of the evidence."); *United States* v. *Martinez*, 938 F.2d 1078, 1085 (10th Cir.1991) ("the possibility that the seized cash was the product of entirely lawful activities goes to the weight of the evidence, not its admissibility."). Relevance under Rule 401 is not a horse race between competing explanations of the evidence's significance, and that Seabrook may propound an alternate explanation of the evidence is not significant under Rule 401. *See McQueeney* v. *Wilmington Trust Co.*, 779 F.2d 916, 921 (3d Cir. 1985) ("evidence need not lead inescapably towards a single conclusion to be relevant, it need only make certain facts more probable than not."). Resolving conflicting explanations of evidence is for the jury. *See DeMarines* v. *KLM Royal Dutch Airlines*, 580 F.2d 1193, 1202 (3d Cir. 1978) (alternate explanations go to weight, not admissibility). An alternative explanation of the evidence is not germane to the relevance determination under Rule 401. *Old Chief* v. *United States*, 519 U.S. 172, 179 & 184 (1997); *see also United States* v. *Schultz*, 333 F.3d 393, 416 (2d Cir. 2003) ("Evidence need not be conclusive in order to be relevant.") (citing and quoting *Contemporary Mission* v. *Famous Music Corp.*, 557 F.2d 918, 927 (2d Cir. 1977)).

Accordingly, the $28,700 seized from the Seabrook Residence is relevant and admissible.

II. **THE COURT SHOULD ADMIT EVIDENCE OF SEABROOK'S POWER TO UNILATERALLY DIRECT THE ACTIVITIES OF THE UNION'S EXECUTIVE BOARD**

The Government submits that it should be permitted to introduce evidence of Seabrook's power, as President of COBA, to direct the activities of the COBA's board of directors (the "Executive Board or "Board") as a whole, as well as of the Board's Annuity Fund specifically, despite the presence of numerous other ostensibly independent voting members.

### A. Relevant Facts

As set forth in the Indictment, COBA is governed, in principle, by an Executive Board consisting of the President, three Vice Presidents, six other non-trustee officers, and Borough Trustees for four of the five boroughs of the City of New York. (*See* Indictment ¶ 7). Although the President has the power to conduct COBA's financial affairs, under the union's bylaws, he must do so in consultation with the Executive Board, and may only deposit COBA funds in financial institutions selected or approved by the Board as a whole. (*See id*. ¶ 8). The COBA Annuity Fund is an employee retirement benefits fund governed by a separate board consisting of a subset of the COBA Executive Board members. (*See id*. ¶ 10). To fulfill his obligations under the scheme alleged, Seabrook was able to steer $15 million from the COBA Annuity Fund into PPVA, a Platinum fund, in two tranches in 2014, largely as a result of the Annuity Fund Board deferring to Seabrook. (*See id*. ¶ 16). Also in 2014, Seabrook invested an additional $5 million from COBA's General Fund into the PPVA, without prior permission from the Executive Board. (*See id*. ¶ 17). The Government expects to present evidence at trial that the other Executive Board members became aware of the $5 million transfer, as Seabrook could have foreseen, and were sufficiently displeased to learn of it that one of Seabrook's longest-tenured Executive Board members confronted him. Nevertheless, despite the Board's disappointment upon learning of the $5 million transfer, no meaningful action was taken by the Board in response to Seabrook's unauthorized movement of the funds.

The Government further expects the evidence at trial to show that Board members could do little about their displeasure with Seabrook's unilateral decision without taking on significant personal risk. Although Seabrook's powers as President were theoretically limited by the Bylaws and the will of the rest of the Executive Board, Seabrook's actual power over the rest of

6

the Board was such that he exerted near-complete control over its actions. For example, as President, Seabrook had control over the "release time" system that allowed the Executive Board's members to serve on the Board full-time instead of working as active New York City correction officers, while still receiving both their correction officers' salaries and a healthy stipend from COBA that could rival or exceed their salaries. Seabrook, as the head of the electoral slate through which the members were elected, also had the political power to control their future as Board members, as the election of members from outside Seabrook's slate was exceedingly rare. Blessed both to avoid working in the jails *and* to receive as significant salary stipend for it, COBA's Executive Board members feared Seabrook's ability to have them "sent down" – removed from their Board positions and returned to full-time Correction Department posts, often in undesirable assignments. The Government expects Board witnesses to testify that Seabrook, a sometimes temperamental leader, was not shy about using his power over other Board members to force agreement on issues that mattered to him, and often browbeat them as a means of demonstrating that power. For example, Seabrook intimidated Board members into approving an annual budget they had scarce had an opportunity to review despite their right to do so under COBA's bylaws, cowing them into submission during Board meetings. As a result, Seabrook's opinions and initiatives were rarely questioned by other Board members, and he was able to control many of the union's affairs, including financial affairs, unilaterally.

    **B. Discussion**

As noted above, evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Fed. R. Evid. 401; *United States* v. *Monk*, 577 Fed.

App'x. 8, 9 (2d Cir. 2014). Seabrook's control over the Executive Board (and, by consequence, the Annuity Fund's separate board) is relevant and should be admitted.

Against the backdrop of bylaws that, on paper, reduced Seabrook to one voting member among several when it came to COBA's financial activities, the actual control that Seabrook wielded makes it more likely than not that Seabrook would have been able to strike an illicit deal with his co-defendant, knowing that he had the ability to deliver on his end of the bargain. This is true both with respect to money that he could direct from the Annuity Fund, and with respect to money from the union's general fund. With respect to the former, Seabrook would have known that it was very possible for him to do what he ultimately did – champion the union's investment in Platinum's fund and likely have the Annuity Fund board members defer to his judgment. With respect to the latter, Seabrook would have known that even if he decided to move substantial amounts of unauthorized funds from the general account, the other Executive Board members would likely not hold him accountable in any meaningful way. In either case, evidence of the power dynamic at play between Seabrook and the Board members beneath him is evidence that he had the means to commit the offense, and is thus plainly relevant.

To the extent that the evidence shows that, in wielding his power over his Board members, Seabrook could be an irascible leader, any prejudice that accompanies this is vastly outweighed by its probative value. A reasonable jury is capable of understanding that Seabrook's being a brusque and muscular leader does not, on its own, make him guilty. On the other side of the ledger, evidence concerning Seabrook's control of Executive Board and Annuity Board affairs touch matters no less significant than whether it was possible for Seabrook to have delivered on the corrupt bargain he is alleged to have made. The calculus clearly weighs in favor of admission.

**CONCLUSION**

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated: New York, New York
September 11, 2017

          Respectfully submitted,

          JOON H. KIM
          Acting United States Attorney

By:   /s/ Martin S. Bell, Russell Capone & Kan M. Nawaday
      Martin S. Bell, Russell Capone, & Kan M. Nawaday
      Assistant United States Attorneys
      (212) 637-2463/2247/2311

cc:    Defense counsel (by ECF).