

305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255

Henry E. Mazurek
Partner
mazurek@clayro.com

September 11, 2017

Hon. Andrew L. Carter
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      **Re:**    *United States v. Norman Seabrook and Murray Huberfeld,* **No. 16 Cr. 467 (ALC)**

Dear Judge Carter:

      We write on behalf of defendant Murray Huberfeld to move *in limine*: (1) to preclude certain evidence about capital activity of the hedge fund, Platinum Partners, during the period of the charged conspiracy; and (2) to preclude the government from introducing truth-telling terms of its cooperation agreement with Jona Rechnitz.

## ARGUMENT

**I.**     **The Court Should Preclude the Government From Offering Evidence about Redemption Activity at Platinum Partners During the Time of the COBA Investments Because This Data Is Not Relevant to the Honest Services Charges and the Prejudicial Value of Its Admission Substantially Outweighs Any Purported Relevance this Evidence Might Have**

      The government's Complaint, 16 Mag. 3626, sets forth the most detail of its case against the defendants.[1] The government's case rests on the testimony of Jona Rechnitz, identified as "CW-1" in the Complaint. Mr. Rechnitz tells the government, in an effort to obtain a cooperation agreement, that he was the intermediary in a cash payment to defendant Seabrook directed by Platinum Partners ("Platinum"), through Murray Huberfeld, in exchange for Seabrook's efforts in securing the New York City Correction Officers Benevolent Association ("COBA") investments into the Platinum hedge funds. (*See* Complaint, ¶ 15.)

---

[1] We also refer the Court to the factual background section in the letter motion being submitted by co-defendant Norman Seabrook on this same issue, which is being filed contemporaneously with this motion.

Platinum was a hedge fund that offered multiple investment funds to high net-worth individuals and sophisticated institutional investors, such as pension funds. Platinum offered, among other options, investment in: (1) the Platinum Partners Value Arbitrage Fund ("PPVA"), an equities-based fund that invested in various industries, including a high concentration in energy related opportunities; (2) the Platinum Partners Credit Opportunity ("PPCO") Fund, a debt-based investment vehicle; and (3) the Platinum Partners Liquid Opportunities Fund ("PPLO"), a smaller fund that focused on shorter-term investments. Platinum conducted business worldwide, using hundreds of bank and brokerage accounts through which it made its diversified investments.

The government identified Mr. Huberfeld in the Complaint as "a founder of Platinum and [ ] a current investor in Platinum's funds." Complaint, ¶ 8e. The affiant agent indicated "that Huberfeld is also, through a trust, a part-owner of Platinum itself." *Id.*

We believe the trial evidence will show that at the time of the events alleged in this case – from the end of 2013 to the beginning of 2015 – that Mr. Huberfeld held no management position at Platinum, or was involved in any of the investment or operational decisions for the funds. Mr. Huberfeld was replaced as managing partner of the Credit Fund, which became known as the Platinum Partners Credit Opportunity Fund ("PPCO"), in January 2011.

The Complaint further alleges, in relevant part, that Rechnitz had known Mr. Huberfeld "for several years" prior to the alleged kickback payment to Seabrook. (Complaint, ¶ 15(b).) Also, Rechnitz "participated in business transactions with Huberfeld." (*Id.*) In essence, Rechnitz acted as a marketing agent for Huberfeld and the Platinum funds. In other words, he solicited possible investors in Platinum.

We believe, based on emails that were produced in the government's discovery, that Rechnitz will testify that, even before he knew Seabrook, Rechnitz had agreed to market the Platinum funds to his network of possible investors. Rechnitz is expected to testify that if he continued to bring investors to Platinum, he would receive direct personal compensation. (*See* Complaint, ¶ 15n.)

Thus, when Rechnitz claims to have introduced Seabrook to the possibility of COBA's investing in Platinum, he acted consistent with his existing arrangement with Platinum and Mr. Huberfeld to solicit investors. In fact, the government concedes this point in its Complaint, which indicates that Rechnitz "was aware that Huberfeld and Platinum wanted to attract institutional investors." (Complaint, ¶ 15g.) His knowledge of this was presumably based upon his prior contacts with Platinum in the context of acting as a marketing agent for the funds.

We present these facts, as we expect them to be presented at trial, because it provides the relevant context within which the government will introduce Rechnitz's

testimony. These facts explain how Rechnitz came to act as an intermediary between Platinum and COBA.

This context also raises great doubt as to the relevance of the financial state of the Platinum fund during the time that Rechnitz was acting as a marketing agent in 2013-14. The introduction of COBA to Platinum was not an isolated or sudden incident. It was part of an existing relationship between Rechnitz and Platinum.

In its Complaint, the government adds its own speculation as to why Mr. Huberfeld allegedly was interested in receiving new investment money for Platinum from COBA. The agent who filed the Complaint reviewed "documents provided in response to a subpoena served on Platinum," and apparently devised his own theory to bolster Rechnitz's proffers. (Complaint, ¶ 22.) This theory related to Platinum's capital activity, *i.e.,* the flow of new investment money to the funds (called subscriptions) compared to outflows from the funds to investors (called redemptions).

The government tried in its Complaint to connect the alleged kickback scheme to Platinum's assumed declining financial condition. However, the data identified in the Complaint relating to the fund's redemption activity in 2013-14 does not support this assumption. The data also does not convey unusual or distressing activity outside the normal course of hedge fund business, or is so equivocal on this point as to require a confusing trial-within-a-trial that should be avoided by the Court under a Federal Rule of Evidence 403 analysis.

Specifically, the Complaint highlighted that during a 15-month time period before March 2014 (a period subjectively selected by the agent), PPVA had more redemptions than subscriptions. (Complaint, ¶ 15a.) Also, the Complaint indicated that on the day that the first COBA investment ($10 million) was deposited in Platinum's PPVA bank account, March 4, 2014, the fund also paid $4.5 million to satisfy investor redemption requests. (*Id.*, ¶ 15b.) Finally, the Complaint identified internal email correspondence in 2015 among Platinum managers about the need to bring new investments to the Platinum PPVA fund, and asking marketing managers to check with Mr. Huberfeld about the possibility of new investments by COBA. (*Id.*, ¶ 15d-g.) Notably, none of this email correspondence included Mr. Huberfeld. Emails were being circulated internally within Platinum to the relevant marketing managers for PPVA, about doing their job of promoting the fund to new investors and soliciting more investment by existing Platinum subscribers.

The government cannot show the relevance of this selected capital activity and Platinum's internal management correspondence to prove any of the elements of the charged crimes, including what is expected to be the most disputed element at trial against Mr. Huberfeld, *i.e.,* his knowledge of whether Rechnitz agreed to pay, or paid, Seabrook an alleged "kickback" for his help in securing COBA's investments in Platinum.

Relevance is the touchstone of determining evidence's admissibility at trial. *See* Fed. R. Evid. 401, 402. Rule 401 defines relevant evidence as: (a) ha[ving] any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Fed. R. Evid. 401. *See United States v. Towne,* 870 F.2d 880, 886 (2d Cir. 1989) (to be relevant, evidence needs to tend to prove the government's case); *United States v. Williams*, 585 F.3d 703, 707 (2d Cir. 2009) (same). The government's proposed admission of PPVA redemption activity is not a fact that has any effect on the highly disputed issue of whether Mr. Huberfeld knew that Rechnitz alleged to have paid a kickback to Seabrook, or whether any payment was made at all.

Even if the Court were to conclude that the government has shown some minimal link between the redemption activity and the charges in the Indictment, this link is too tenuous and remote, has too high a probability of confusing the issues and misleading the jury, and the potential prejudice is just too great to Mr. Huberfeld to be admitted under Fed. R. Evid. 403. *See United States v. Al-Moayad,* 545 F.3d 139, 160 (2d Cir. 2008) (Rule 403 requires "the district court [to] make a conscientious assessment of whether unfair prejudice substantially outweighs probative value" with regard to each piece of proffered evidence) (quoting *United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998)). *See also Old Chief v. United States*, 519 U.S. 172, 184 (1997) ("[W]hat counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives."). The government seeks to taint he jury with this irrelevant evidence so that the jury could convict on the improper basis that Mr. Huberfeld knowingly jeopardized COBA pension money. This is not a case about whether fraudulent solicitations of investments were made; it is a straightforward "kickback" scheme that should be tried on its merits. Adding this possible other motive to the scheme is not provable on the proposed evidence and becomes impermissible "other act" evidence on the pending charges. The government cannot meet its evidentiary burden under either Rule 401 or 403.

**First**, the government's attempt to introduce evidence about Platinum's redemption requests in 2013-2014 should be precluded by the Court as clearly irrelevant to any fact of consequence at trial.

The government alleged in its Complaint "that the PPVA had redeemed more money . . . than it had taken in money from new investors," "during the 15 months preceding COBA's original investment in the PPVA in March 2014," (Complaint, ¶ 22a.) This fact, even if true, does not make it more or less probable that Mr. Huberfeld would have agreed to pay a kickback to Seabrook for COBA's investment in Platinum. First, the period reviewed by the agent was completely arbitrary; there is no indication that this time period had any relevance to Mr. Huberfeld's decision-making at the end of 2013, when the alleged agreement with Seabrook was reached. Also, this general statistic does not inform us about the financial health of PPVA. Indeed, it raises more questions than it answers, such as whether these redemptions surpassed new investments by any material margin, or whether the government's calculation of capital inflows included re-

investments by existing subscribers to the fund, as opposed only to new investment money. Further, while funds would always like to grow its investor base, by the end of 2013, the PPVA already had considerable capital to invest: PPVA had approximately $800 million and the Platinum group had approximately $1.28 billion in assets under management. (*See* PPVA Disclosures to COBA, Dec. 1, 2013, Bates COBA1435.) Even if the fund did not attract substantial new investment dollars during this short-term period (Platinum, in various forms, had already existed since about 2003), this did not signify that it lacked the capital to conduct its regular investment activity. Finally, the fact that investors were redeeming profits in the 15 months leading up to March 2014 could also mean that the fund was earning large returns (it reported average annual returns at the time of over 18%), and investors wanted to realize those profits, as opposed to the government's preferred inference that the firm was facing any kind of distress. In sum, this general statistic about redemptions over an arbitrary period is either meaningless or too opaque to matter (especially since it is not related to anything the government claims was communicated by or to Mr. Huberfeld in the relevant period).

**Second,** it does not follow that the redemption data the government seeks to introduce at trial even leads to an argument that the PPVA fund was under financial stress at the time, or that this was something that motivated Mr. Huberfeld's conduct. The government's attempt to misuse redemption data in this way will require the defense to introduce expert testimony regarding general financial activity of hedge funds. This will inevitably lead the jury down a path of cumbersome and confusing evidence that is very peripheral to the disputed elements of the crimes charged.

For example, the government apparently believes that it is a relevant fact that Platinum PPVA made redemption payments in the amount of $4.5 million on March 4, 2014, the same day that it deposited new investment money from COBA. (Complaint, ¶ 22.) The government's view reveals a complete lack of understanding of hedge fund operations, and the particular operations of the PPVA fund. According to the terms of the PPVA Private Placement Memorandum ("PPM") entered into by COBA, investors were required to give at least 60-days' notice of any redemption requests (other standard PPM agreements with PPVA required 90-days' notice). (*See* PPVA PPM with COBA, at 52, Bates PlatPartners 0000092.) The PPM also provided that after an investor's notice period, PPVA administrators had another 30 days to fulfill the redemption request. (*Id.*) PPVA's bank statements simply corroborate this standard operation. For the last quarter of 2013, the total redemption requests made by PPVA investors equaled approximately $4.5 million. These redemptions were to be paid by the end of the first quarter 2014, which is in March. Thus, the payment of the $4.5 million on March 4 was simply in compliance of the standard PPM terms. The amount of redemptions is also not noteworthy. As stated above, the fund had nearly $800 million in assets under management. $4.5 million, therefore, amounted to less than one percent of PPVA fund assets.

A quick review of other PPVA redemption payments made in 2014 reveal that the $4.5 million redemption payment made in March 2014 was very ordinary. On May 1,

2014, PPVA made payments of approximately $5 million (in response to first quarter redemption notices); the fund also made redemption payments in August 2014 in the amount of $2.6 million (for requests made in the second quarter).[2] A history of the fund's redemption payments in prior years does not show that these regular quarterly payments were historically noteworthy or communicative of any dire circumstances. Thus, the government's suggestion that redemption payments made in 2014 are relevant to show some desperate need by PPVA fund managers, or more specifically some panic by Mr. Huberfeld, to bring in new investments is simply not accurate.

**Third,** the government's reference to internal Platinum email correspondence in 2015 about raising new investment money for the funds, or going back to existing investors to add money to their subscriptions, is not indicative of any criminal conspiracy. It simply provides evidence of how fund managers typically operate. There is nothing relevant to Mr. Huberfeld's alleged knowledge of kickback payments to Seabrook about the fact that PPVA's Managing Partner pushed his marketing team about possible new fund subscriptions in 2015, including inquiring about possible new investments by COBA. As noted above, this correspondence does not even appear to include Mr. Huberfeld, who at that point in time, had no management role at Platinum, other than being a sizable investor himself.

Further, the time period of this correspondence in April and May 2015 appears to be outside the relevant scope of events charged in this case. According to the government's own version of charged events, the Complaint reveals that as of early February 2015, the alleged co-conspirators are known not be able to obtain any additional COBA investments because of an "internal problem" at COBA. (Complaint, ¶ 20d.) Thus, the additional correspondence in April and May 2015 between Platinum's Managing Partner and marketing staff seeking new investments from COBA appears to be outside the time period of events relevant to the charged conspiracy.

**Fourth,** the hedge fund redemption data and activity that the government seeks to introduce is beyond the ken of an ordinary juror. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167 (1999); Fed. R. Evid. 702, 703. If the government persists in seeking to introduce this evidence, the defense will be compelled to counter it with expert testimony about the operations of hedge funds, the meaning of subscription and redemption activity in the course of operations, and to opine on the relevant period of capital activity that the government seeks to introduce. A specific subject matter expert on hedge fund operations and financial data would be needed to give responsible meaning to this evidence. For example, the government would be misleading the jury if it tried to simplify the complex operations of a multi-fund investment business such as Platinum into a narrow comparison between PPVA subscriptions and redemptions. An expert would be needed to explain the many layers of fund operation, such as the normal

---

[2] This data was obtained from the PPVA bank account statements produced by government in discovery.

business of liquidating investments to pay out redemptions (not having to rely solely on new subscription liquidity), the ability of one Platinum fund to borrow inter-account from other more liquid funds (inter-account transfers among the hundreds of Platinum bank accounts holding investments), and other typical industry practices for dealing with the ordinary business cycles of uneven cash flow.

If the government seeks to introduce the suggested redemption activity at Platinum as relevant to a disputed issue at trial, the defense would be compelled to obtain expert testimony in response, which could then elicit further expert testimony from the government in its rebuttal case. All of this will create an unnecessary trial-within-a-trial on an issue that is very peripheral to the core disputed facts at trial. *See United States v. Aboumoussalem*, 726 F.2d 906, 912 (2d Cir. 1984) (finding court was within discretion under Fed. R. Evid. 403 to avoid confusing jury on issues of minor relevance that required own trial-within-trial); *see also United States v. George*, 266 F.3d 52, 63 (2d Cir. 2001) (granting broad discretion to district court to exclude evidence pursuant to Rule 403).

In sum, the Court should preclude the proposed redemption evidence as not relevant under Fed. R. Evid. 401, 402, or as too prejudicial under Fed. R. Evid. 403, and because it consists of subject matter that requires a witness with specialized knowledge to testify about it for a jury to understand the import of the evidence or determine its relevance to a fact at issue at trial. *See* Fed. R. Evid. 702.

> II. **The Court Should Preclude the Government from Admitting Evidence of Truth-Telling Requirements In Its Cooperation Agreement with Jona Rechnitz or that Breach of these Requirements Carries Penalties Including the Government's Release from Filing a Section 5K1.1 Motion at Sentencing**

In June 2016, Jona Rechnitz pleaded guilty to honest services fraud under the terms of an as of yet undisclosed cooperation agreement with the government. To date, the government has declined to produce Mr. Rechnitz's witness's statements, including his cooperation agreement, until two weeks prior to trial. By ruling of today, this Court declined to direct the government to produce this material any sooner.

Upon information and belief, however, we are fairly certain that this cooperation agreement includes a section which requires Rechnitz to "truthfully and completely disclose all information" about his criminal activities. This language is standard in the cooperation agreements used by the United States Attorney's Office for the Southern District of New York. For reasons previously stated in Mr. Huberfeld's pretrial motions (*see* ECF Doc. Nos. 72 and 76), we also believe that the government currently possesses third-party, independent information that contradicts or undermines disclosures made by Rechnitz to the government during the period of his cooperation. Specifically, we believe the government has information that clearly indicates Mr. Rechnitz knowingly participated in a fraudulent scheme to deceive and harm investors in the Jason Nissen

ticket business, which is the subject of a separate criminal case brought by this same United States Attorney's Office. *See* Criminal Complaint, *United States v. Nissen,* 17 Mag. 4096 (S.D.N.Y. 2017). Despite information contained in (1) the government's own wiretap evidence, (2) evidence of a secret recording of Jason Nissen taken by some of his ticket investors, and (3) email evidence, the government continues shockingly to "dispute[ ] the defense characterization of Rechnitz as an 'apparent co-conspirator' of Nissen." (Gov. Opp. Br. to Defense Pretrial Motions, ECF Doc. No. 74, p. 39.)

It appears the government is taking the all-too-technical position that because it only charged Nissen with a "Ponzi-like" scheme that began in 2015 with respect to two particular fund investors, about which the government does not have direct evidence of Rechnitz's involvement, that Rechnitz is not a co-conspirator with Nissen as to **that** particular scheme to defraud. In doing so, the government is guilty of paltering. *See* Todd Rogers, Richard Zeckhauser, Francesca Gino, and Michael I. Norton, *"Artful Paltering: The Risks and Rewards of Using Truthful Statements to Mislead Others,"* The Journal of Personality and Social Psychology, Vol. 112, No. 3, p. 456 (2017) ("Paltering is the active use of truthful statements to convey a misleading impression."). Despite this semantic play, the government knows that Rechnitz failed to disclose his fraud with Nissen relating to all other misrepresentations to investors that Rechnitz conspired with Nissen to make during their long course of business together. The government cannot avoid its good faith obligations to enforce the terms of its cooperation agreement with Rechnitz by narrowly looking only to a sliver of evidence of the ticket business fraud.

The government possesses specific evidence that Rechnitz acted in conspiracy with Nissen to defraud investors from at least 2013 onward, including (1) deceiving investors about the value of specific ticket investments; (2) scheming to prioritize certain investors over others; (3) failing to disclose the size of Rechnitz's commissions, which were often greater than the expected profits from the ticket resale business, and (4) providing material false information about other investors in the business. We also know that Rechnitz did not plead guilty to the ticket business mail and wire fraud. We believe that the reason the government did not require such a guilty plea, in contravention to its standard policy, is because Rechnitz did not disclose this crime during his initial proffer sessions with the government in 2016. Instead, the government learned about this scheme from Jason Nissen, who self-surrendered to prosecutors this past spring.

The government's failure to enforce in good faith its standard cooperation provision, requiring Rechnitz to "truthfully and completely disclose all information" about his criminal activity, reduces this agreement and its threatened penalties to a legal fiction. To date, the government has not indicated whether Rechnitz has violated this provision of his agreement. If he has violated this term, the government would be released from filing any motion pursuant to Section 5K1.1 of the Sentencing Guidelines. If this is the government's current view, it has an obligation to convey it to defense counsel and the Court now. The government should not be able to bolster its own witness's credibility by presenting this "truth-telling" requirement of its contract with

Rechnitz as evidence that Rechnitz has a tremendous motive not to lie, while at the same time, possessing information that he already did so.

The defense starts at a unique disadvantage with regard to the government's cooperation agreement. The witness will not admit his own lies: that is clearly to his disadvantage. He will deny ever doing so on cross-examination. The government also will not admit at trial that its witness did not comply with the terms of his cooperation agreement by withholding important information about his criminal activity during his proffer sessions. The government further will seek to bolster Rechnitz's credibility by showing the jury that he has a tremendous incentive to tell the truth because otherwise he risks losing any benefit of his cooperation agreement, particularly the motion he seeks the government to make on his behalf at sentencing.

The defense is then forced to correct the government-sponsored falsehood that Rechnitz remains in compliance with the government's agreement. The defendant is forced to challenge the credibility of prosecutors from a disadvantaged starting position in which juries typically look to defense attorneys and their clients with great skepticism. Indeed, the United States Court of Appeals for the Ninth Circuit recognized this popularly believed but usually unspoken fact: "The jury understands defense counsel's duty of advocacy and frequently listens to defense counsel with skepticism." *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000). On the other hand, the United States Supreme Court noted long ago what also remains true today: "the average jury" has unique "confidence" in prosecutors precisely because jurors know that prosecutors have a "duty to refrain from improper methods calculated to produce a wrongful conviction" and expect that this duty "will be faithfully observed." *Berger v. United States,* 295 U.S. 78, 88 (1935).

When the government ignores this duty, by skirting its obligations under its witness's cooperation agreement or taking a too-technical – or paltering – position with respect to the witness's prior disclosures, it should not be able to stand behind the legal fiction that its witness has a unique motive to tell the truth at trial. Shifting that obligation to the defendant creates an intolerable risk that the government's "improper suggestions" and "insinuations . . . are apt to carry much weight against the accused when they should properly carry none."[3] *Id.*

---

3   The typical answer to the problem presented here is that defense counsel has the effective remedy of cross-examining the witness and exposing his prior lies. However, this does not resolve the underlying danger resulting from the government's inherent bolstering of its witness by standing behind its cooperation agreement, even in the face of knowledge of prior breaches. If a witness is confronted by defense counsel with evidence of prior lies, the jury is still left with the fact that prosecutors have endorsed this witness by maintaining a legal contract with him despite the testimony given at trial. No exhaustive or effective cross-examination will remove the implicit imprimatur of the government, which arises out of the introduction of the cooperation agreement and its strict terms, which require the witness to tell the truth. Simply by standing behind that

While we continue to urge the Court to conduct an evidentiary hearing to determine whether the government is carrying out its obligations under Mr. Rechnitz's cooperation agreement in good faith,[4] in the alternative, we seek to preclude the government from introducing the truth-telling requirements of this agreement.

Longstanding case law in this Circuit prohibits the government from bolstering its witness's credibility by introducing evidence of the cooperation agreement on direct examination. *See United States v. Borello*, 766 F.2d 46, 56 (2d Cir. 1985) (holding that the admission of and reading from the truth-telling portions of a cooperation agreement on direct examination were not harmless error even though the defense subsequently challenged part of the witness's testimony). We also acknowledge subsequent case law that has approved the government's seeking to admit bolstering aspects of cooperation agreements after the defendant attacked the credibility of a witness. *See United States v. Cosentino*, 844 F.2d 30, 33 (2d Cir. 1988) (allowing government to admit terms of cooperation agreement including penalties for failure to testify truthfully only after the defendant attacked the witness's credibility).

This case, however, is different from this standard line of cases. Here, the government possesses information that should objectively cause it to find Mr. Rechnitz in breach of his cooperation agreement. *See United States v. Petkash*, 1996 WL 282138, *3 (2d Cir. 1996) ("[P]rosecutors' discretion us limited by the requirement that it be exercised fairly and in good faith."). Therefore, it should not be permitted to bolster Rechnitz's testimony with the truth-telling or penalty terms of the agreement even after the defendants challenge, as we most certainly will, the credibility of this witness. If the Court allowed the government to present these terms of the agreement, under these circumstances, it would sanction the government's knowing presentation of a fact that the government knows to be false, *i.e.,* Rechnitz has "truthfully and completely disclosed all

---

agreement and its truth-telling requirement, the government gives the jury the "improper suggestion" that it still believes its witness and therefore the jury should too.

[4] The government should also be directed to disclose Rechnitz's witness statements prior to two weeks before trial so that this issue can be properly litigated reasonably in advance of trial. Defendant Huberfeld has made more than a *prima facie* showing of the factual predicate for his position that Rechnitz is currently in breach of his cooperation agreement. *See* Mazurek Decl., ECF Doc. No. 77 (8/7/17). We should not have to wait until two weeks before trial to present the Court with additional evidence of our position. The government has been in possession of these statements for more than a year and a half. There is no risk of safety to Mr. Rechnitz at this stage of the proceedings. His name has been repeatedly identified in the press for almost this entire period. The government should also produce any and all information it possesses regarding Mr. Nissen's proffers relating to Rechnitz's involvement in the fraud. We ask only for sufficient time for an orderly and complete hearing of the facts that give rise to this fundamental due process issue.

information" relating to his criminal activities as required under his agreement. *See Napue v. Illinois*, 360 U.S. 264, 270 (1959) (when a prosecutor knows that a fact is false, he "has the responsibility and duty to correct what he knows to be false and elicit the truth").

While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88. It hardly squares with principles of due process for the government to present to a jury the truth-telling requirements and penalties of a cooperation agreement that the government has no intention of enforcing. Unless the government can convince this Court that it has a sufficient and justified basis for believing Mr. Rechnitz's statements over objective wiretap evidence and the Nissen recording it possesses, it should not be able to bolster Rechnitz's testimony – that he did not knowingly conspire with Nissen to commit investor fraud in Nissen's ticket business – with provisions in the cooperation agreement that already have been violated.

We respectfully ask the Court to preclude the government from introducing the truth-telling terms of its cooperation agreement with Jona Rechnitz, even after the defense challenges his credibility, unless and until the government can present evidence as to its reasoning for maintaining the agreement despite being in possession of competent evidence that Rechnitz failed to "truthfully and completely disclose all information" of his criminal activity.

Respectfully yours,

/S/HEM

Henry E. Mazurek

Evan L. Lipton
Winston & Strawn LLP
200 Park Avenue
New York, New York 10166

*Counsel for Defendant Murray Huberfeld*